THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* José LUIS LUGO, Defendant and Appellant.

No. CR-70-33.     Decided March 9, 1972.

*Torres González & Torres González* for appellant. *Gilberto Gier-bolini, Solicitor General,* and *Peter Ortiz, Assistant Solicitor General,* for The People.

PER CURIAM: Appellant was accused of a violation of § 32 of the Weapons Law consisting, according to the information, in that "on or about September 1, 1967, and in Río Piedras, Puerto Rico . . . unlawfully, willfully, intentionally, maliciously, and criminally he aimed a black revolver with a short barrel, which is a firearm, at Mr. Wallace González without this being in self-defense or in the discharge of his official duties."

The trial having been held, the court found him guilty of the offense charged against him, and after refusing him the benefit of a suspended sentence, punished him to serve six months in jail.

Appellant alleges on appeal that the trial court (1) "committed a reversible error in finding defendant guilty of vio-

lating § 32 of the Weapons Law despite the fact that the evidence submitted by the prosecuting attorney established the commission of a different offense not included within the facts charged," and (2) "the said court committed error upon refusing the benefits of the act on suspended sentences to the defendant despite considering it a meritorious case."

As stated by the Solicitor General succinctly and insofar as pertinent, the evidence for the prosecution established the following:

"On September 1, 1967, he went to visit appellant Lugo at his residence. He arrived there in a taxicab accompanied by his father Mr. Francisco González. The defendant-appellant invited them in. All sat down at the dining room table. The witness explained to appellant that he had with him the documents for the culmination of a civil litigation between the Archbishop of San Juan and Mr. Lugo and told him that he was bringing $7,200 in cash. (*Id.* p. 44.) The defendant started to examine the letters and asked Mr. Francisco González to retire, which he did. Then the defendant took out some other documents and placed them on the table making some comments. Then the following occurred as reported by the witness during the trial:

'Once he took out the Providencia's check book and put it close to me, at this place where the church documents were, he went to the satchel and looked for something as he was previously doing, more or less in the same manner, he sat down and took out both hands and in his right one he had a black glove or at least a color similar to black, quite dark, and in that hand he had a revolver of a dark gray color, that is a dark color, leaden dark and with that hand, with that revolver that was loaded he aimed at me assuming more or less this resting position on the table. And told me "And here . . ."'

'JUDGE:

'Q. We are going to ask the colleague to show the gesture made by the witness for record purposes.

'A. This way. This way.

'PROSECUTING ATTORNEY:

'The right arm elbow rests on the table.

'A. This way. Exactly, at about 45° on both sides, and

then he told me "here is a revolver with six bullets for you," and I told him "aren't you ashamed of yourself to do something like this," he told me "to consider it as a holdup, as a robbery or as you wish, but if you want to leave this place alive, you are going to do exactly what I say." Then he told me "the papers," now I am describing the church documents, "those papers you pick them up and take them along with you, take out the $7,200 and lay them on the table's corner," that would be the corner to my right-hand side. "Leave the other papers, pick up your coat and get going" I then started to organize that mass of church papers that were somewhat disorganized and started to put them in order little by little to pick them up and take them with me. Then with a choleric gesture he got up from the chair from where up to that moment he had been aiming at me with the loaded revolver and then brandishing close he stood up at a distance as from that desk to where I am.

'JUDGE:

'How much do the colleagues stipulate for record purposes?

'MR. TORRES GONZÁLEZ:

'About four feet.

'MR. BELÉN TRUJILLO:

'Yes.

'A. He aimed that revolver at my head and then he said "something like don't play anymore with those papers . . ."

'MR. TORRES GONZÁLEZ:

'Objection, Your Honor.

'JUDGE:

'Granted, the witness may say what he said but not what he imagines.

'A. Words, words that do not play any more with those papers and finish.

'Q. Just a moment. Witness, are you sure that he said that or do you imagine it?

'A. I cannot say those were the exact words, Honorable Judge. Words more or less like those.

'Q. Then he made a statement, right?

'A. He made a statement, I remember he said "because I am going to commit a blunder," brandishing the revolver and aiming directly at my head. Well, then, I told him "well then, you give the orders you have the gun" and did exactly what he told me, I took the papers that were placed on the corner on top of the church documents, I fixed them, more or less grouped them, then I took out the $7,200 which up to that instant I was keeping in my right pocket, I laid them on the right corner of the table, then I got up, picked up the coat which I had left there on my right-hand side and then I left his house. On leaving the house I met my father who was on the porch, we exchanged glances and I told him "come on" and we left.' (Tr. Ev. pp. 54 to 58, Stenographer Aurelia Román Martínez.)" (Solicitor General's Report, pp. 2 to 5.)

Although the evidence for the prosecution contains all the elements of the offense of robbery (33 L.P.R.A. § 851) it is no less true that the evidence strictly establishes the commission of a violation of § 32 of the Weapons Law which to that effect provides:

"Any person who, otherwise than in self-defense or in the discharge of official duty:

(a) .    .    .    .    .    .    .    .

(b) intentionally although without malice aims a revolver, pistol or other firearm toward any person; or

(c) .    .    .    .    .    .    .    .

(d) ... shall be guilty of a misdemeanor."

Two different offenses penalized by different statutes are involved. In certain robbery cases the elements constituting the offense penalized by § 32 of the Weapons Law may also be present. Nevertheless, for an act to constitute the offense of robbery there must necessarily be present other elements in addition to those contained in § 32 of the Weapons Law, as is the taking of personal property from the person of the owner thereof against his will by means of force or fear.

We are not deciding now that the appellant could have been prosecuted for the commission of the two offenses, that of robbery and that of violation of § 32 of the Weapons Law. He was prosecuted solely for the commission of this last offense.

■ What we decide is that there was no inconsistency between the information and the evidence and that therefore Rule 38 (d) of the Rules of Criminal Procedure is not applicable.

Let us consider the second error.

■ Despite the fact that the Probation Officer's Report was favorable to defendant-appellant, the trial judge refused him the benefit of a suspended sentence because he understood that the law did not grant him the authority to do so.

We will not stop to discuss this matter. Act No. 93 of May 30, 1970, now grants him that authority, clearly and beyond doubt.

Therefore, we will remand the case for the trial court to determine whether or not, in the light of the facts, the corresponding reports and other pertinent circumstances, the defendant-appellant is entitled to receive the benefit of a suspended sentence.

We have disposed of the only two contentions made by the defendant-appellant in this appeal. He does not challenge the weighing of the evidence made by the trial judge, nor the credibility of the witness for the prosecution, Mr. Wallace González, is challenged. Neither does the defendant-appellant complain that his right to a fair and impartial trial was impaired. His principal contention, as we stated, is that the facts established by the evidence for the prosecution constitute a robbery offense, and not a violation of § 32 of the Weapons Law, which is the offense for which he was accused, tried and convicted.

The evidence for the prosecution and that for the defense was conflicting and the trier of the facts settled the conflict

against appellant in giving credit to Mr. Wallace González' testimony. Part of this testimony was corroborated by the defendant himself. They differ insofar as the criminal act in itself is concerned in that defendant Lugo, even though he admitted that he took out the revolver from a file and laid it on the table, he denied having aimed it at Mr. Wallace González. On pronouncing the judgment of conviction the judge stated as follows:

"In this case the only thing the court has to determine is whether or not the defendant aimed a revolver intentionally, although without malice, at Mr. Wallace González.

"As to the account offered by the Prosecuting Attorney and the defendant's testimony, they coincide in all the particulars except as to whether or not he aimed the weapon and except as to who eventually retained the $7,200.

"The defendant himself from the witness stand ratified practically the testimony offered by colleague Wallace González in all its parts as to his arrival, the taxicab, instructions, and the defendant himself stated the purpose of Mr. Wallace González' visit to his house in his testimony.

"The defendant himself testified that Mr. Wallace González spoke about a supposed transaction. They showed certain documents. That he rejected those documents. That there was a monetary offer. That there were $7,000 and that he saw several one hundred dollar bills. That the defendant was offered money. That he rejected the transaction because he did not believe it to be correct and because the papers did not say anything about the money.

"That is, that the defendant's own testimony ratifies practically in all its parts the testimony offered by colleague Wallace González.

"As we previously stated what there remains for the court to determine is whether or not the defendant's guilt has been established beyond reasonable doubt or if, in other words it has been established beyond reasonable doubt that on the date stated on the information the defendant intentionally aimed a revolver at Mr. Wallace González without it being in self-defense or in the discharge of official duties.

"The court, as a result of all the evidence offered, considers that defendant's guilt has been established beyond reasonable doubt for which reason the court finds defendant, José Luis Lugo, guilty and he is convicted of violation of § 32 of the Weapons Law of Puerto Rico in the case M67-1990." (Tr. Ev. II, pp. 26 to 28.)

Let us see what Lugo testified regarding this point on cross-examination:

"PROSECUTING ATTORNEY:

Q. You say that you placed the satchel on the table, correct?

A. Correct.

Q. You took out a file and then took out the revolver and then took out the file, correct?

A. I put ...

Q. Excuse me, but first answer my question if it is correct that you stated that in the direct?

A. I cannot, precisely ...

Q. No, no, I want you to draw on your memory and to tell me whether it is correct or not?

A. I am going to tell you; previously what ...

Q. You did not answer that way?

A. I say, if you ask me again.

Q. If it is correct that you answered that after placing the satchel on the table you took out the file?

A. Yes.

Q. Then there was a revolver, did you take it out?

A. Yes.

Q. Then you opened the file and took out the revolver?

A. I did not take out the revolver alone, the revolver with the file.

Q. Everything at the same time?

A. Afterwards I took out the file and then a package from the file where the revolver was.

Q. First you took out a file?

A. Yes.

Q. And then another file where the revolver was?

A. Correct.

Q. Previously what you took out first were the files not the revolver?

A. Yes, some because there are many that are still there.

Q. And those files you were delivering them one at a time to Mr. González from one place to another on the table?

A. Yes, sir.

Q. From your own testimony at the Injunction hearing, I read from page 88 of the transcript where you say 'I placed the satchel on the table and then inside the satchel there was a revolver, I laid the revolver on the table and I handed him the documents' that is, here you say 'I laid the revolver on the table and then handed him the documents' and told him . . . 88 colleague, 'and told him to please leave my house.'

A. Mr. Prosecuting Attorney when I was . . .

MR. TORRES GONZÁLEZ:

We are going to make an objection to the question as to 'lay down'; this comes from a series of questions . . .

JUDGE:

Just one moment. What is the objection?

MR. TORRES GONZÁLEZ:

The objection is that the witness, the prosecuting attorney is reading, he is reading to the witness who does not have . . .

JUDGE:

Objection denied. The witness may state whether or not the question was asked.

A. Mr. Prosecuting Attorney, when I was asking that question I was not entering on the facts of the case which we are seeing today, we were talking about the Injunction case and Mr. Ochoteco, may he rest in Peace, asked me and he did not go into the details whether it was first; all that or if it merely gets into the thing for the first . . ., now I am explaining it in detail.

PROSECUTING ATTORNEY:

Q. You were not asked that. Is it correct what you testified in that hearing 'I placed the satchel on the table then inside the satchel there was a revolver. I laid the revolver on the table and handed him the documents and I told him to please leave my house.'

A. Yes, sir I testified that." (Tr. Ev. Piece I, pp. 349 to 353.)

Lugo's testimony was not only contradicted by Mr. Wallace González but by Mr. Omar Cancio as well. Lugo testified that he came to know of the $7,000 offer to compromise the

case when on the first day of September 1967 Mr. Wallace González offered them to him on the visit he made to him at his house. Lugo gave the impression, besides, that no invitation mediated for the visit which Mr. Wallace González made to him.

Yet Mr. Cancio testified that he had been dealing with Lugo's case for 5 or 6 weeks, as his attorney, and that they had agreed to ultimate a compromise at his office on the first day of September and that Lugo was to receive $7,000. He also testified that in view of the fact that Lugo did not show up at his office at the hour agreed upon, he phoned Lugo who informed him that he was ill; that Mr. Wallace González should go to his home accompanied by someone.

In this case the prosecuting attorney did not suppress evidence and therefore the presumption that all evidence voluntarily suppressed would result adversely, if offered, is inoperative. Although it is true, and there is no controversy on that point, that Mr. Francisco González, Jr., accompanied his son Wallace González to defendant Lugo's house on the day of the events, it is no less true that at the defendant's own request, Mr. Francisco González, Jr., withdrew from the dining room where the three were and went to the porch of the house, before the occurrence of the criminal act charged against appellant. The record does not show that he witnessed the incidents and therefore his testimony could not give any light about the offense with which Lugo was charged.

The admissibility of the testimony of Mr. Francisco González, Jr., about what his son told him afterwards, while returning in the taxicab concerning what happened in Lugo's house is very doubtful, since as testimony of exception to the rule of hearsay evidence, it does not seem to comply with the requirements established by the case law.

In any event, nevertheless, the presumption established in the Law of Evidence is only an element of evidence to be considered jointly with the other evidence when the attention

of the trier is called to it. Neither at the trial court nor at this Court the defendant-appellant has complained of the suppression of any evidence by the prosecuting attorney. At the trial the defendant showed interest in knowing the testimony of the taxicab's driver who took Mr. Wallace González and his father to Lugo's residence. The prosecuting attorney did not have that testimony and the defendant desisted from his contention. As to the possible testimony of Mr. Francisco González, Jr., he did not demonstrate any interest and did not make any contention concerning said testimony. If, despite the fact that in a particular case a presumption of that nature arises, the trier is convinced by the other evidence that the defendant is guilty of the offense charged against him beyond reasonable doubt, his judgment of conviction must be sustained on appeal, in the absence of other errors warranting its reversal, and this does not happen in this case.

. Although the criminal acts occurred on the first of September and the complaint was filed on the 19th of that same month, it cannot be inferred from that fact that it was a false complaint. On the same day of the events Mr. Wallace González called Mr. Omar Cancio by phone but as a result of an objection from the defense Mr. Omar Cancio was not allowed to testify on what Mr. González had informed him.

On the same day of the events Mr. Wallace González had told what had happened at Lugo's home. Four days later he went to see a prosecuting attorney in relation to the said events and he also talked to a judge. So that Mr. Wallace González did not conceal with his silence for 18 days the events about which he testified in the instant case.

During the pronouncement of sentence in this case the defendant informed the court that Mr. Wallace González was unjustifiably pursuing him. Neither was that accusation made under oath nor was it substantiated by any evidence. The defendant said that the day before Mr. Wallace González had filed a complaint against him for security to keep

the peace and that he had been arrested and bailed. On the date of that complaint for security to keep the peace the court had already rendered its judgment of conviction in this case. There is no evidence that such complaint was false. On the contrary, what may be asserted in that respect is that a magistrate had found probable cause to accuse Lugo.

Finally we will say that the credibility of witness Mr. Wallace González is not affected by the fact that he was the plaintiff's attorney in an action for injunction and declaratory judgment brought by the Archbishop Mr. Aponte Martínez against defendant Mr. Lugo. It was precisely as a result of said relations that the criminal acts in this case arose. We add as an appendix to this opinion, the findings of fact made by the trial court and which were affirmed by this Court in the case of *Aponte Martínez* v. *Lugo*, *ante*, p. 281, decided on November 29, 1971.

The entire record reveals that the trial judge correctly and impartially settled the conflict in the evidence against the defendant-appellant making thus fulfilled justice.

Judgment will be rendered accordingly.

Mr. Chief Justice Negrón Fernández, Mr. Justice Hernández Matos, and Mr. Justice Martín took no part in this decision. Mr. Justice Rigau, with whom Mr. Justice Torres Rigual joins, dissented. Mr. Justice Martínez Muñoz, with whom Mr. Justice Pérez Pimentel, Mr. Justice Dávila, and Mr. Justice Ramírez Bages join, concurred in a separate opinion.

—APPENDIX—

*Per Curiam Opinion*
Cr-70-33

*"FINDINGS OF FACT*

"I Towards the end of May 1967 and to become effective on the first of June 1967, plaintiff Luis Aponte Martínez, Arch-

bishop of the Archdiocese of San Juan, appointed the defendant the administrator of the Church property under the following terms and conditions:

"a) The job would be subject to a working test period of two (2) months and would continue at the expiration of the said term at the option and discretion of plaintiff.

"b) The salary that the defendant would receive would be $1,200 monthly.

"II Toward the last days of July 1967 plaintiff called the defendant to his office and informed him, that although he was satisfied with part of the work that he had performed, he was not satisfied as to the economical aspect and expenses, warning him that probably he would have to dispense with his services. During the first days of August 1967 he had another meeting with the defendant, informing the latter about his final determination of dispensing with his services.

"III Plaintiff granted and paid defendant the salary for one month not worked at the time of his discharge.

"IV On August 15, 1967, plaintiff received a letter from the defendant (Plaintiff's Exhibit 1), in which, after pointing out alleged irregularities which in his opinion he had found concerning the administration of the Catholic Church estate, he requested plaintiff, insofar as his discharge was concerned, to elect one of three alternatives to wit:

1—'Statement of the reasons for the discharge.

2—Reinstatement to my job or

3—A just indemnization.'

"Besides, he indicated to plaintiff, that if he did not consent to his petition within the terms set forth in the same, defendant, would publish that letter in the following manner:

'1—Within three days from the date on which you receive this report, if I have not had a decision or a communication from Your Excellency, I will send a copy to all bishops of Puerto Rico, to the Papal Nuncio in Santo Domingo, and to the Secretary of State of Your Holiness.

'2—If within ten (10) days Your Most Reverend Excellency has not taken a satisfactory decision, I will furnish a copy to every priest in the island.

'3—If within five (5) days my demands have not been taken care of, it will be sent to all persons concerned with

the funds of Hospital de la Providencia, Institutions for the Protection of Poor Children, Department of Justice, and to all persons related with the Seminar.

'4—If my allegations are not taken care of, I would take my labor claim to the competent courts.

'With this I try to prevent scandal and at the same time not to give up on some unquestionable rights. It will not depend on me and the moral consequences of these acts cannot be attributed to me, since it is your decision which will determine the actions to be weighed.

'This being a matter, as I said at the beginning, of a labor relations nature, I pray you to prevent religious implications, inasmuch as it would involve another aspect of the matter even more painful.'

"V Upon receiving the said letter plaintiff requested the advice of his attorneys with respect to the same and two interviews were held during which defendant requested from plaintiff thru his attorney Mr. Wallace González to pay him the sum of $89,000, and to provide him at plaintiff's own expense seven (7) plane tickets to be used by defendant and his family to go to Hawaii, everything as the price for not carrying out the threats which he set forth in his aforementioned letter.

"VI The plaintiff flatly rejected said petition, telling defendant that if his lawyer made any reasonable recommendation he would be willing to give it as a benevolent or generous act but not to give a sum of money to prevent the circulation of the letter. Mr. Lugo said that on account of that letter he was willing to go to jail (Tr. Ev. pp. 36–37). When his attorney explained the defendant's claims, plaintiff told him that he did not accept that type of indemnization and much less to give any money in that way, that he preferred to take the matter to court (Tr. Ev. p. 41), and this resulted in the filing of this action, in which it is requested that (a) Declaratory Judgment be entered to the effect that defendant has no right to any compensation as a result of his discharge in addition to the monthly pay which he had already received; and (b) that a Preliminary Injunction be decreed and in due time a Permanent one prohibiting defendant the publication or circulation of the letter referred to.

"Summing up the allegations set forth in plaintiff's Exhibit I, the position adopted by defendant in Exhibit I, is the following:

"(a) That the defendant was discharged without just cause merely because he started to get acquainted with matters which he considered were sensitive and delicate for the Church.

"(b) That defendant understood that in the year 1948 the Catholic Church Extension Society donated $50,000 for a Seminar, and that these funds were used to buy the same amount of money in war bonds without the final destination of that donation being known.

"(c) That the defendant understood that the funds recommended for the Hospital de la Providencia were used, in part, for loans and acquisition of properties to the prejudice of the donors.

"(d) That the defendant understood that the properties donated in 1891 by the Marquis de Vallejo to the Sociedad Protectora de Niños Pobres de Puerto Rico had been used for other purposes without having benefited the poor children of Puerto Rico.

"(e) That the defendant understood that parishes had been 'penalized' with a quarterly quota that resulted in a negative economical impact for the activities of the parishes.

"We will analyze the position adopted by the defendant as set forth under letters a, b, c, d, and e.

"(a) Regarding the position adopted by defendant in his letter report (Plaintiff's Exhibit I) the evidence clearly established that:

"The discharge of the defendant was due to the fact that the plaintiff was not satisfied with the defendant as to the economical aspect and administrative expenses and the appointment being for a definite term with two months working test period, he could be discharged by the plaintiff at the latter's discretion as we shall see hereinafter. *Wolf* v. *Neckwear Corp.*, 80 P.R.R. 519.

"(b) With respect to what is set forth under letter (b) it was established that on the date on which defendant wrote his letter of August 15, 1967, already in the year 1948, the Church had issued three checks (Plaintiff's Exhibits 6, 7, and 8) in the amount of $50,000 in favor of the Seminar. That the defendant, if he did not have said information, should have taken the pertinent steps for investigating at the accounting office of the Archdiocese (as Administrator of the Church property it was at

his disposal) to establish the fact that the sum of $50,000 had been sent to the Seminar in 1948.

"(c) Concerning paragraph (c) it was established that at the time that defendant wrote his letter of August 15, 1967, he had knowledge that (a) the funds of the Hospital de la Providencia were secure; and (b) that the Archbishopric was contemplating to consult the donors to find out whether they agreed to authorize the use of said funds for other activities, and in case of a negative answer to the consultation then the money plus interest would be returned to them.

"(d) Concerning this paragraph the evidence established that when the defendant wrote his letter of August 15, 1967, defendant, despite having been Administrator of the Church properties, he had at his reach the source of adequate information that: (a) in the year 1894 the Marquis de Vallejo's proxy had executed an Additional Deed which empowered the bishop (today the Archbishop of San Juan) to select the poor children who were to benefit from the contributions of the Sociedad Protectora of said poor children (Plaintiff's Exhibit 2); (b) that making use of his powers, the Archbishop had canalized the aid thru Colegio de la Milagrosa where a large number of Puerto Rican poor children and orphans are kept at a cost that fluctuates close to $40,000 annually; and (c) that the Venezuela property was not part of the Marquis de Vallejo's donation.

"(e) In connection with what is set forth under letter (e) it appears from the evidence that at the time defendant wrote his letter of August 15, 1967, the defendant, as Administrator of the Church properties, had at his reach the source of adequate information and he knew that the said quotas were imposed after a meeting with the priests.

"VII Plaintiff has been audited in all its operations and in relation to all its properties as well as to all funds to which Plaintiff's Exhibit I refers up to the year 1966 by the reputed accountant firms Ernst and Ernst and Aníbal Muñoz (Plaintiff's Rebuttal Exhibit I and Exhibit II), contracted as external auditors for those purposes and the result of the audit performed by said accountants was that the items questioned by the defendant were correct.

"VIII The court concludes, besides, that after this trial had commenced defendant designated Attorney Omar Cancio to

represent him in the litigation; that Mr. Cancio held a series of interviews with the plaintiff's attorneys and with the Archbishop himself which culminated in an agreement between Attorney Cancio and plaintiff's attorneys, to the end that the litigation would terminate under the following grounds:

"(a) Plaintiff would give to Mr. Lugo $7,200 or the equivalent of six months pay, as an act of generosity.

"(b) At the request of Mr. Cancio, who said that it would be hard for defendant to get a job, plaintiff would deliver to Mr. Lugo a letter to the effect that he was not discharged for moral cause but for discrepancies of an administrative nature.

"(c) Defendant would deliver to plaintiff another letter admitting that the publication or circulation of the Exhibit was unjustified.

"(d) Defendant would return to the plaintiff all the documents that he had removed from the Archbishopric archives without the latter's consent.

"(e) A reciprocal relief would be granted and then plaintiff would file a motion for Voluntary Desistance with a draft of an Order for dismissal of the case.

"All the pertinent documents listed above were prepared by mutual agreement between plaintiff's attorneys and Mr. Cancio. (Mr. Wallace González' Testimony—pp. 131–132.)

"On September 1, 1967, when Mr. Cancio and Mr. González Oliver planned to sign the documents, and put an end to the case, Mr. Cancio phoned Mr. González Oliver to inform him that the defendant could not go to the former's office to sign the documents because he was not feeling well. During their conversation, Mr. Cancio and Mr. González Oliver agreed that Mr. Wallace González Oliver would visit defendant's residence to sign the documents and deliver the money, and also to pick up the documents belonging to the church which the defendant had retained and which would be returned by the defendant as it had been agreed. Mr. González Oliver called Mr. Lugo by phone, who told him that he would be waiting for him at his residence for the indicated purposes.

"Mr. González Oliver left for defendant's house accompanied by his father Mr. Francisco González, Jr. Defendant received them at the living-dining room of his residence. Mr. González Oliver delivered to defendant for his examination the documents they had agreed upon. At defendant's request, Mr. González

Oliver informed him that he had brought the $7,200 agreed upon, in cash.

"After some comments by the defendant regarding the documents he asked Mr. González, Jr., that because of the latter's close relationships with the Church, defendant would prefer to remain alone with Mr. González Oliver, because he wanted to talk privately with him regarding certain facts. Mr. Francisco González, Jr., pleasing the defendant retired to the house's balcony.

"Before, when attorneys González arrived in a taxicab at the defendant's residence, defendant told the taxicab driver to withdraw to a shrub that was at a distance to get protection from the sun.

"Once by themselves, defendant and Mr. González Oliver, in the living-dining room, the former started to pull out documents from his satchel which was laying at a corner of the table, at the head of the table opposite that occupied by Mr. González Oliver, and he started to describe said documents to Mr. González Oliver, among which there were six or seven copies of Plaintiff's Exhibit I, some six or seven envelopes with their addresses among which there were envelopes addressed to Monsignor Rafael Grovas and to Monsignor Fremiot Torres Oliver, and a series of documents belonging to the Archbishopric records which the defendant had retained.

"That Mr. Wallace González Oliver abandoned defendant's house without the defendant having signed the documents which he had agreed to sign."[1]

---

[1] For the purpose of this appeal we consider it unnecessary to make any determination whatsoever as to what happened to the $7,200 that Mr. Wallace González took to defendant's house inasmuch as we are considering a civil action (Injunction) which is an action in equity and we are not dealing with a case of a criminal nature where our Constitution and state laws grant the parties ample opportunity to set up their defenses. Any determination the court may make as to the money or any other incident allegedly occurred between Mr. González Oliver and the defendant, we repeat, could affect the rights consecrated in our Constitution to every person for the possible commission of an offense, without allowing him his day in court.

—O—

Mr. Justice Rigau, with whom Mr. Justice Torres Rigual joins, dissenting.

San Juan, Puerto Rico, March 9, 1972

I feel under the obligation to dissent in order to follow the dictates of my conscience. I would rather not have to enter into the details which follow, but I have to do it to explain why I dissent. Otherwise, my dissent could seem capricious.

I believe that the circumstances of the instant case were such that appellant did not have a fair and impartial trial. I make myself clear in the course of this opinion.

As it is known, this Court is not necessarily bound to accept the findings of fact of the trial courts. The law itself provides that this Court is not a mere court of cassation, but that *in order to prevent injustice* it may take cognizance of all the facts and proceedings in the cases.[1]

The instant case is one of those cases where it is necessary for the Court to question, examine, and review the findings of fact of the trial court.

In this particular case, José Luis Lugo was charged with a violation of the Weapons Law, violation which allegedly consisted in that Lugo aimed a revolver at Attorney Wallace González.[2] The only two witnesses were the complainant and the defendant. The complainant stated that the defendant aimed a revolver at him and the defendant said that that is not true. The facts allegedly occurred at defendant's own home. In his visit to the defendant's home, the father of the complainant accompanied the latter to the former's house, but he did not testify at the trial.

In order to place this case in its actual perspective it

---

[1] 4 L.P.R.A. § 36.

[2] Pursuant to § 32 of the Weapons Law, it is a misdemeanor to *aim* intentionally a firearm toward a person. 25 L.P.R.A. § 442(b).

is necessary to point out that the same *is only an episode in a broader set of facts.* In another case which is also a consequence of those facts, this Court summarized *part* of the same.[3] In that case we set forth, in synthesis, that in May 1967, Archbishop Aponte Martínez retained the services of José Luis Lugo, appellant herein, as Administrator of the properties of the Catholic Church in Puerto Rico. As a result of several important discrepancies they had, which are already of public knowledge in Puerto Rico, the Archbishop discharged Lugo from his work.

Lugo thought his discharge was unjustified and he addressed a letter to the Archbishop dated August 15, 1967. In said letter Lugo stated that in the event that he did not receive an answer, he would send a copy of the same to a number of persons he mentioned there.

What we must decide in the case under our consideration now is whether or not the judgment appealed from should be reversed. In order to form a fair judgment about this, it is necessary to know the aforementioned facts and also to consider the facts set forth hereinafter. Only then could we appreciate to what appellant has been submitted and then only could it be established whether appellant had a fair and impartial trial in the case at bar.

Lugo's letter to the Archbishop is dated August 15, 1967. On the 21st of that same month, the Archbishop filed before the Superior Court of San Juan, a complaint against Lugo, where he requested the court, among other things, to bar Lugo through an injunction, from publishing the above-mentioned letter. A Superior Court judge sustained the complaint and issued an injunction barring Lugo from publishing his writing. Said injunction was void because it constitutes a violation of the freedom of the press guaranteed by the Constitution of Puerto Rico and by the First Amendment of

---

[3] See *Aponte Martínez* v. *Lugo, ante,* p. 281.

the Constitution of the United States. Said injunction was an example of prior restraint and it could not prevail. The Supreme Court of Puerto Rico reversed said order in the aforementioned case of *Aponte Martínez* v. *Lugo, supra.*

While still pending in the aforementioned case the question of whether or not Lugo could publish his writing, Attorney González, then counsel for the Archbishop, called Lugo at his house, on September 1, 1967, and told him he wished to see him. They agreed to meet that day at noontime at Lugo's residence, in Ward Cupey of Río Piedras, Puerto Rico. The meeting was held on the date and at the place indicated. Attorney González' father accompanied him to Lugo's residence.

After the usual greetings and while sitting at the dining room table at Lugo's house, attorney González showed some documents to Lugo. These consisted of the following:

(1) A letter from the Archbishop, addressed to Lugo, telling him that the reason for the discharge was of an administrative nature, but that there was no reason of moral character whatsoever in said discharge; (2) a letter prepared for Lugo's signature, addressed to the Archbishop, where Lugo would state that the properties of the church had been properly audited and that there was no anomaly whatsoever; (3) an agreement or release letter where the Archbishop and Lugo agreed not to sue each other in court, and (4) a writing addressed to the court to abandon action.

About this, Lugo testified as follows:

"So, I read the letter, I read the documents and I told him that I was not satisfied, I gave him my explanation and then he offered me an amount of money that he brought in order to settle said action then, well, he took a certain amount of money from his pocket and told me there was $7,000. After a while, just for security, $8,000, and he placed it on the table where he was sitting. So then I told him that . . . I asked him where in that document did it appear that he was going to give me a certain amount of money so that I would settle the litigation or

whatever this is called, then he told me that it did not appear at any place, that that was a secret between the Archbishop, Mr. Wallace González, and myself, the three of us.

JUDGE: Where was attorney González, senior, while you were talking?

A. He was on the porch of my house at a distance of about ten feet.

Go ahead.

A. I told him I did not think it was proper to talk about this case in such a manner that the money did not appear, as a receipt or a document. . . .

Q. Witness, while this happened, where were you?

A. I was sitting at my dining room table which is about 6 feet long. I was at one end and he was at the other.

Q. He was at about 6 feet from you?

A. Yes.

Go ahead.

A. I told him how was it possible that this remain a secret, that I thought that it was not proper. In the first place, that type of crookedness." Tr. Ev. pp. 232–235.

When Lugo started to testify about those documents, the judge suggested to the prosecuting attorney to object on the basis that the papers themselves were the best evidence, but previously, when the witness for the prosecution testified about said documents, the judge remained silent. Tr. Ev. p. 232.

Coming back to the facts, it was on September 1, 1967, that attorney González visited Lugo and showed him the documents he had prepared in the event a compromise was arrived at in connection with the civil action between the Archbishop and Lugo. As it comes forth from the above-copied, Lugo disagreed and attorney González offered him the $7,000, but Lugo did not accept. It is at this stage of the events that, according to attorney Gonzalez' version, Lugo, at gunpoint, got hold of the $7,000 in cash which attorney González carried.

According to attorney González' testimony, after that he

and his father took a taxicab and returned to San Juan. They came from Cupey to San Juan, but they did not stop at any of the police stations there are on the way to inform of the holdup of which, allegedly, the witness for the prosecution had been a victim. During the following 18 days he did not say anything to the police, despite the fact that—he affirms —$7,000 had been taken from him in his presence.

The civil case of injunction against Lugo was set for hearing on September 20, 1967. It was exactly the *day before* said hearing that the police was informed of the alleged holdup which occurred *18 days before* and that *night,* September 19, 1967, Lugo was arrested at his home. Lugo described this in the following manner:

"A. They summoned me for September 20, for a hearing of the injunction, to be heard on September 20.

Q. Was it heard on that occasion?

A. Yes, sir, it was heard.

Q. I ask you whether you were charged with something on that occasion.

A. The previous night, September 19, 3 detectives went to my house with two warrants of arrest, one for § 8 and the other for § 32, where attorney Wallace González accused me of not having a license to possess a weapon." Tr. Ev. p. 226.

The case for violation of § 8 of the Weapons Law was decided in favor of the defendant, for it was determined that there was no probable cause. Lugo had a license to possess a firearm. I think that this complaint was unjustified because it was very easy to prove, before it was filed, whether or not Lugo had a license to possess a weapon in his house.

Without any apparent reason they waited until nighttime to arrest him, in his home, creating thus a terrifying sensation of anxiety and defenselessness in his wife and his children. The arrest carried out at night made the situation more difficult for Lugo. In order to protect the persons who live in this society from the cruelty of an unnecessary arrest made during the night in the home of the person, Rule 10 of the

Rules of Criminal Procedure provides that if the offense charged is a felony, the arrest may be made at any time of the day or night, but if the offense charged is a misdemeanor, the arrest cannot be made at night, unless the magistrate who issued the warrant shall so authorize it. In both cases the arrest may be made during the day.

The following dialogue which took place during the cross-examination of the witness for the prosecution, attorney González, sheds additional light on this whole situation:

"ATTORNEY BELÉN TRUJILLO: Tell me whether or not it is true that the day following the filing of the complaint in the Superior Court, San Juan Part, before Judge Rivera Barreras, and in the presence of attorney García Cabrera, you asked, you suggested to the defendant and his counsel that if he desisted from the injunction case you would, in turn, withdraw this complaint?

A. At no time did I tell the defendant that in turn . . . *that that change could be made.*" (Italics ours.) Tr. Ev. p. 80.

Up to this moment Lugo's situation in this narrative is that he is being sued before the Superior Court in the injunction case and he is charged with two alleged violations of the Weapons Law, in one of which there was no probable cause and the other one is the case at bar. He was arrested the night of September 19, 1967.

At this stage of the proceedings, on August 5, 1968, they retained the services of a *private detective*—according to the sworn statement of the detective himself—in order to make inquiries about Lugo.

On November 4, 1968, attorney González filed a complaint for undertaking of bail against Lugo.

The Superior Court had set for the *7th of that month of November* the act of pronouncement of sentence in the case at bar. They arrested Lugo again on the *6th*, this time again just *the day before* the day for which he was summoned for the hearing in court. This arrest of November 6, 1968, was

based on the complaint for security to keep the peace filed on the 4th, despite the fact that since the same 4th the warrant of arrest was signed. Lugo was fixed a $3,000 bail for his freedom, bail which was later reduced to $500.

As it may be seen, the treatment towards Lugo was again unnecessarily severe. A person like appellant, with permanent domicile in Puerto Rico, with wife and six small children who live with him at his home, who also works in Puerto Rico, is not the type of person who is expected to leave the country in order to avoid trial. It is precisely for those cases that this Court amended, in 1966, Rule 218 of the Rules of Criminal Procedure in order to give express power to the magistrates to require bail only when necessary. In an official pronouncement of the Judicial Conference of the United States (National Conference on the Judiciary) of March 14, 1971, the following is said about that particular:

"Money bail should be replaced to a very large extent by the practice of releasing on their own recognizance as many persons as can reasonably be expected—in view of their roots in the community—to appear for trial."

Also, for the above-mentioned reasons, a warrant of arrest did not seem necessary, but rather a summons could have been issued. Also on this particular the National Conference on the Judiciary has recommended the following:

"Except in the case of a serious crime committed by an adult, a summons or citation should be used in lieu of arrest."[4]

It should also be noted that Lugo's trial for the *misdemeanor* was not held at the District Court (despite the fact that Lugo requested the transfer for the District Court) as it is done with the other persons accused of a misdemeanor, but, on the contrary, it was held by the court without a jury

---

[4] Institute of Judicial Administration Report, July 1971. In a similar sense, see Rule 7(a) of the Rules of Criminal Procedure.

in the *Superior Court,* where traditionally in Puerto Rico justice is more severe than in the District Courts.

When Lugo appeared before the court to be tried in the case at bar, he arrived accompanied by a presumption of innocence. The court had only two testimonies for consideration: that of the defendant himself, who denies that he aimed at him, and that of the witness for the prosecution, who affirms it. The testimony of the witness for the prosecution in this specific case could properly have been subject to reasonable doubt. The witness for the prosecution in the instant case was also the complainant who filed complaint against Lugo (in the case of undertaking of bail) and he was the *attorney for the plaintiff* who sued Lugo (the case of injunction). Even the most calm and honorable persons may be mistaken, against their own will, as a result of a momentary passion. I understand that before an impartial trier, all that, together with the clearly conflicting nature of the evidence, must have given rise to a reasonable doubt which, in addition to the presumption of innocence, should have concluded in a judgment of acquittal.

Also important is the fact that in the action for security to keep the peace, Lugo was able to present five distinguished persons of excellent prestige in the community, as witnesses on his character. In the case at bar itself the report of the probation officer is highly favorable to appellant.

A spontaneous expression of the judge in an exchange with the prosecuting attorney in the case at bar, lets us guess the psychology which permeated the atmosphere in which this case was heard. The judge said:

*"Considering the public interest involved in this case,* despite the fact that *we have departed from the proceedings, we have wanted to seek to do* justice to all the parties involved. . . ."* (Italics ours.) Tr. Ev. IV, pp. 70–71.

It is not sufficient to *want* to do justice, nor to *seek* to do justice; much less *wanting to seek to do* justice; it is necessary to *do* justice.

Another example of that psychology which weighed on this proceeding is the following: The trial judge, despite the fact that on several occasions he stated that the report of the probation officer "is highly favorable" to the defendant;[5] despite the fact that he stated that he would not grant a suspended sentence because he understood that he was not empowered to grant it; despite the fact that he said "if we were empowered by law, we would grant him the right to a suspended sentence" (Tr. Ev. IV, p. 104); and despite the fact that he stated that "God grant" that the Supreme Court concludes "that we erred in our appraisal of the Suspended Sentence Act" (Tr. Ev. IV, p. 110), in sentencing him he imposed a penalty of *six months* in jail, when he could have imposed upon him the minimum, which is *30 days*. 25 L.P.R.A. § 442(b) and 25 L.P.R.A. § 451.

I consider that the statement made by appellant to the trial judge when the latter was ready to pronounce sentence is pathetic. The incident is as follows:

"JUDGE: Lugo, do you want to say something before I pronounce sentence?

Defendant: I wish you would let me say something because an incident which is connected with this same matter took place.

JUDGE: You are warned that any statement that you make . . . I advise you to ask your counsel's advice first, because any statement in the proceeding . . .

Defendant: I would like to mention to you so that you know, that the court may know how I have been persecuted since the beginning of this case, since its origin. . . . Look, Your Honor, last year on September 19, when they arrested me, that they charged me with §§ 8 and 32, the next day, on September 20, the injunction was to be heard. On November 6 they arrested me again in my house under a complaint of coercion or for security to keep

---

[5] Tr. Ev. IV, pp. 102, 103, 104, 105, 118.

the peace, when today is the day when sentence was to be pronounced for me. They asked the court to fix me a high bail, they fixed a $3,000 bail, and I went to the judge and explained the case, the information which is here, and they reduced the bail to $500 and he gave me until today to furnish bail. Attorney Wallace González filed the complaint.

JUDGE: On what date?

Defendant: Yesterday.

JUDGE: Go ahead.

Defendant: Attorney Wallace González filed the complaint against me because a private detective who passed himself off as a friend of mine was present at all times, and on the first day I met him I noticed he was coming with something; on several occasions he told me that he knew you, Your Honor, because you were a member of the Lodge and he was a member of the Lodge and he could help me in this case. I always kept my mouth shut because I thought that this individual was looking for something. Later on this man visited me at my house, do you understand, under the conditions in which I and my wife were, he suggested to bring a nurse to take care of my wife who was sick and he offered a certain amount of money, and later on I took him to attorney Raúl Torres González, that he could intercede with Wallace to arrange this matter. This man and Wallace González charged me with planning a murder, a mass murder, I am going to murder attorney Wallace González Oliver for having filed a complaint against me, after you sentence me, he charges that I am going to murder attorney Francisco González, his father, he charges that I am going to murder the Archbishop. I wish you would read and see this, such an unfair complaint that this man makes. I can prove, Your Honor, that in the action for damages that it says that that amount was for attorney's fees, that he gave to attorney Wallace González, and he charges that I took that money from him. Now this man keeps this persecution, I have six children, among them the youngest who was born 60 days ago, how can you expect that I can go and plan a mass murder, as is the case in which this man accuses me here, and this private detective who signs that sworn statement to keep this persecution. *I think I have some type of protection because this is something unjustified, Your Honor.* I wish you would read this complaint, what this man explains,

attorney Wallace González Oliver, and which he signs in his own hand which is the most absurd thing one can imagine. The only offense I have committed has been to clarify the financial position of how the money of the catholic class is used. That is the only wrong thing I have done, I have done it as a catholic, who practices his religion and a fervent one."[6] Tr. Ev. IV, pp. 118–119, 122–125. (Italics ours.)

In the light of the circumstances I have described, I understand that in the instant case the defendant was tried in an atmosphere charged with emotion which undoubtedly, involuntarily clouded the sound discretion of the trial judge. In similar cases where the emotion has been less, we have reversed judgments because we have found that the defendant did not have a fair and impartial trial. I am convinced that in the instant case the fair thing to do is to reverse the judgment appealed from. I do not think that the defendant had a fair and impartial trial; I feel that in the same there are sufficient elements to create reasonable doubt; and I believe that the due process of law was only observed pro forma. Under those circumstances, it is not fair to send a man to jail. I think we have never done it before.

## II

I have read the separate opinion of the distinguished Brother. I consider that I should detail some particulars mentioned therein.

In said opinion it is said that the evidence was conflicting only insofar as to whether or not appellant aimed the revolver and that there is no discrepancy about the other factors. Precisely. If the weapon has not been aimed, the offense has not been committed, notwithstanding that "there is no dis-

---

[6] The leaders appearing at the beginning of what was stated by the defendant in what was copied above means that a dialogue between the judge, the prosecuting attorney, and the counsel, on whether or not the judge should allow Lugo to speak has been omitted for being considered unnecessary.

crepancy about the other factors." My position is that all the other factors are irrelevant to the effect of convicting appellant in the instant case and that all said factors created an atmosphere which did not render the trial impartial. *Cf. Fournier* v. *People of Puerto Rico*, 281 F.2d 888 (1960); *cert. denied*, 364 U.S. 915 (1960).

It is also set forth in the separate opinion that appellant took out the revolver and laid it on the table. In my opinion there is a great difference between taking out a revolver from a pocket or from a holster and placing it on the table in the middle of a transaction, or taking it out *incidentally*, while rummaging in a satchel or portfolio to take out some documents. Let us see the following.

The prosecuting attorney asked Lugo whether it was true that he testified "I placed the satchel on the table, then inside the satchel there was a revolver. I laid the revolver on the table and I handed him the documents and I told him to please leave my house." Without hesitating, Lugo answered, "Yes, sir, I testified that." Tr. Ev. case M-67-1990, pp. 352–353. When they asked Lugo why he had taken out the revolver, his answer was "well, because when I was taking out the documents it was inside the documents."

It appears from the testimony that the revolver and the documents were in the satchel and that Lugo took out the revolver just as he could have taken out any other object which might be therein (a book, a thermos bottle, etc.) and he laid it on the table and he took out the documents in question. I think that the spontaneity and veracity of Lugo's testimony is evident. Had he been an evil person he could have denied that he placed the revolver on the table. However, he did not deny it. Obviously, to place a revolver lawfully possessed on a table in one's own residence is not an offense.

In the opinion it is set forth that it is not fair to use a rule which is tantamount to a straitjacket for a witness

because he is also an attorney. I think it is not necessary to say that I have never maintained such an idea. A basic idea guides me through all this matter. This is that the mission of the law is to perform justice, and we are dealing with that here.

The separate opinion mentions the faith in the integrity of the judges. I think that is irrelevant. I also share that faith. What happens is that that integrity is not questioned here in any manner whatsoever. Precisely, in this opinion I have stated that the trial judge, in my opinion, erred "undoubtedly, involuntarily." But even if I had not made that exception, by any chance are we going to believe that when a judge dissents, or when an attorney assigns errors, that is tantamount to not trusting the integrity of the judges? The only thing which that implies when it is done is that one thinks that the other is wrong. In no manner whatsoever is the integrity of the judge or of the court from whom or from which dissent or appeal is taken, put at stake or in doubt. Neither are we going to fall in the error of believing that because the judges are honest, they are infallible. It must be understood that to question the fallibility is not the same thing as to question the integrity.

In the separate opinion it is argued that according to the conclusions of a judgment mentioned therein, the defendant had requested $89,000 and other things. In the first place, does that prove whether or not he aimed the revolver at the witness for the prosecution?

In the second place, in order to support that, some lines at p. 346 of the record in the civil case No. 67-4447 are cited. I think that the spontaneity and veracity of Lugo's testimony can be gauged better if we start reading that incident in the previous page. It says thus:

"Q. That amount of eighty-nine thousand dollars alleged in the complaint and seven airplane fares to be used by you and your family, explain that situation, if that is correct.

A. He should have, attorney González, in his brief case, if I am correct, *he had a yellow pad like the one he has there, where he multiplied by ten years my annual salary, then he divided it* by two and I think he told me that the result was from ninety, eighty, or seventy-five, more or less. Since I was not thinking about that question of money nor was he, how would I say . . . as attorney, nor did I understand that he was talking as an attorney, as his counsel, I told him—'look, let us think about this and you call me on Monday.' He told me—'let us do it that way because I am on vacation leave, but it is somewhat late.' He had not had lunch yet, neither did I, but we kept on talking, then, when he accompanied me to the door of his house, he gave me his hand and greeted me, I, as a joke, told him—'tell Monsignor to send me something to make a trip,' but I never mentioned fares to Hawaii. Why should I go to Hawaii when my family is here?

Q. Are there many persons in your family?

A. I have five children, my wife, and myself.

Q. Are there seven?

A. Yes, sir, seven.

JUDGE: The joke was to give you how many fares?

A. To give me a fare to make a trip, I did not mention any amount of fares.

Q. You did not say how many?

A. No, sir." Tr. Ev. II, pp. 345–346. (Italics ours.)

I consider that as a juridical methodology, especially in the penal field, the theory set forth in the separate opinion to the effect that "The interval—from exhibiting to aiming— seems too short for us, and evidently also for the judge who saw and heard the evidence." The idea behind that statement, idea which was not concluded in said paragraph, seems to indicate that on account of that shortness of the interval from exhibiting to aiming we can *assume* that he aimed. Following that line of thought, there is a shorter interval between aiming and firing. Can we also assume that he fired? To send a man to prison because the interval between exhibiting and aiming is too short is something unheard of.

As it is known, in criminal law the *presumption* is of the innocence and not of guilt of the defendant.

In essence, the position of the majority consists in relying on the manner in which the trial judge settled the conflict of the evidence. My position is that, in the light of the attendant circumstances in the case, which I have described before, the conflict of the evidence was wrongly settled by the trial court.

In view of the facts of the instant case it should not suffice, in my opinion, to rely on what the trial judge did. *When it is a matter of doing justice* and not merely of deciding abstract points of law, we are bound to firmly apply the bistoury of reason to the mantle in which the case is wrapped—all types of conclusions of the trial court—and to open it completely so that we can thus examine its entrails. Only thus can justice be made.

To do that is nothing new; there are a legion of cases in which we have done it: for example, in *People* v. *Aletriz,* 85 P.R.R. 621 (1962) (Pérez Pimentel) and in *People* v. *Serrano Nieves,* 93 P.R.R. 55 (1966) (Dávila), the Court went beyond the errors assigned on appeal and examined and passed on the evidence for the purpose of doing justice. In both cases the judgment appealed from was reversed. Recently, in *Malavé* v. *Hospital de la Concepción, ante,* p. 54 (1971) (Martínez Muñoz), the Court again reversed on the grounds that the trial judge weighed the evidence wrongly.

The law is a normative discipline, it tends to that which "should be." It is not merely an unconcerned juridical science. Before the narrowness of mere formalism, it is proper to oppose the human and ethical contents which inform it. All the circumstances of the instant case constitute the substratum of the same. Therefore, to decide it on its real merits it is necessary, I think, to see it as a whole. Without malice for any party, with consideration to all, that is, just as God lets me see it, what I believe.

—O—

Separate opinion of MR. JUSTICE MARTÍNEZ MUÑOZ, in which
MR. JUSTICE PÉREZ PIMENTEL, MR. JUSTICE DÁVILA, and
MR. JUSTICE RAMÍREZ BAGES concur.

San Juan, Puerto Rico, March 9, 1972

I have voted to affirm the judgment object of this appeal.
I am convinced that in the prosecution against appellant the
rules for the due process of law were scrupulously observed.
A minute examination of the record of this case should con-
vince the most exacting person that no result other than the
affirmation of the judgment proposed in the opinion of the
court is proper in this appeal.

I agree with my Brother that the law authorizes us to
take cognizance, in furtherance of justice, of all facts and pro-
ceedings in the case; and to place this case in its *actual per-
spective* (using his words) it is necessary that the factual
situation which serves as a background to the criminal acts
in this case be considered. I refer to the facts as they appear
from the record of the case *Aponte Martínez* v. *Lugo, ante*,
p. 281, decided on November 29, 1971. I consider it an excess
of my powers as justice to use others which, like some of the
ones used by the dissent, do not arise from the record. Here-
inafter I will make reference to them. The most elementary
principals of justice, the inherent condition of abstention
which entails the position of judge, and the law itself in
authorizing me to take cognizance of all the facts, . . . *as they
appear in the record,* require us thus.[1]

---

[1] The Act of March 12, 1903, 4 L.P.R.A. § 36, reads thus:
"The Supreme Court of Puerto Rico shall hereafter be a court of
appeals and not a court of cassation. In its deliberations and decisions, in
all cases, civil or criminal, said court shall not be confined to the errors
in proceeding (procedure) or of law only, as they are pointed out, alleged
or saved by the respective parties to the suit, or as set fourth (forth) in
their briefs and exceptions, but in furtherance of justice, the court may
also take cognizance of all the facts and proceedings in the case *as they*

The evidence which the trier had before himself was conflicting only as to the point as to whether appellant aimed a revolver at the person of the witness for the prosecution. There is no discrepancy about the other facts. During the cross-examination the prosecuting attorney was able to establish that appellant took out the revolver, that the revolver was loaded with five bullets. (Tr. Ev., Vol. I, p. 358) : that he laid the revolver on the table; that he handed certain documents to the witness for the prosecution and told the latter "please leave my house." This was established through the confrontation of appellant with his previous testimony, also on cross-examination, in the action concerning injunction and declaratory judgment prosecuted in the Superior Court (Tr. Ev., Vol. IV, p. 88—Civil Case No. 67-4447) :

"Q. You were not asked that. Is it correct what you testified in that hearing 'I placed the satchel on the table and then inside the satchel there was a revolver. I laid the revolver on the table and I handed him the documents and I told him to please leave my house.'

A. *Yes, sir, I testified that.*" (Italics ours.) ·

As to the offense charged, the only element of the same, denied by appellant, was that he had aimed the revolver at the witness for the prosecution. The magistrate settled the conflict against appellant. Appellant does not challenge that weighing of the trial judge. The dissent, nevertheless, assumes the position that the trial court wrongly settled that conflict of evidence.

To arrive at said conclusion, the dissent indicates that before an impartial trier, the testimony of the witness for the prosecution could properly have been subject to reasonable doubt, which, together with the conflicting nature of the evidence, should have concluded in a judgment of acquittal,

---

*appear in the record,* and likewise consider the merits thereof, so as to promote justice and right and to prevent injustice and delay." (Italics ours.)

expressing his view in my opinion unjustified, that in this case "the due process of law was only observed pro forma", and leaving on the unaware person the impression that all this matter has been nothing more than the result of an abhorrent complot or confabulation to annihilate appellant because of his daring in attempting against alleged rights of the adverse party in the civil case.

I

The dissent throws doubt on the credibility of the witness. It is attributed to the fact that the witness performed three different roles, all adverse to the defendant. The first, his condition as attorney in the civil case (*Aponte Martínez* v. *Lugo, supra*). The second because said witness was at the same time complainant in the criminal case (object of this appeal). And the third, because the witness was complainant in a proceeding concerning undertaking of bail brought against the defendant.

His role as lawyer. I do not believe in privileges. It is unnecessary to say that they were not claimed here. It is not necessary to summarize here the testimonies that appear in the record of the case. Neither do we have the purpose of going back and refer ourselves to the evidence presented in the civil case. It suffices to point out, as it is set forth in the opinion of the majority, that it was precisely because of the relations of the witness for the prosecution as attorney in said case that the criminal acts in this one arose. In the former the court adjudged the controversy between the parties in relation with the dismissal of the appellant and rendered judgment supported on findings of fact which it formulated based on oral and documentary evidence. This Court by the unanimous vote of the judges who intervened affirmed said judgment. The findings talk for themselves.

The credibility of the witness should not be affected by the fact that he acted as attorney in that case. The rule of

weighing used by the dissenting voice, if it would prevail, would put a severe and unjust restriction against a class, the attorney who in particular is bound to inform about all criminal acts committed in his presence. The attorney does not have nor should demand any privilege as witness except as for matters which by law are privileged. Neither is a rule which is tantamount to a straitjacket in the exercise of his rights as a person, as citizen and as an attorney, fair. My faith in the integrity of the judges of our country compels me to reject the idea that they could result incapable of following the dictates of a sound and wise criticism in their mission of eviscerating the truth for the fact that complaining attorneys are present in the scene of the prosecution and the evidence is conflicting.

The testimony of the witness for the prosecution was ratified practically in all its parts by appellant. In this appeal it is not the appellant, but the dissenting opinion, the one that challenges the credibility of the witness. An examination of the transcript of evidence in the civil case—used by the dissenting opinion to place the instant case in its *actual perspective*—will demonstrate that appellant, then defendant, corroborated in part the testimony of the attorney as to an important aspect. According to the conclusions in that judgment, the defendant therein had requested the other party to pay him the sum of $89,000, plus seven plane tickets to Hawaii —all that as the price for him not to carry out his threats— (Civil Case No. 67-4447, Finding of Fact No. V). The defendant therein testified that what he said to the attorney was *"as a joke"*: "tell the Monsignor to *send* me *something* to make a trip, but I never mentioned fares to Hawaii."

"JUDGE

Q. The *joke* was to give you how many fares?

A. To give me a fare to make a trip, I did not mention any amount of fares.

Q. You did not say how many?

A. No, sir." (Italics ours.) (Tr. Ev., Vol. II, p. 346, Case No. 67-4447.)

We find that explanation extremely strange, of a very doubtful credibility, coming from a person who maintained that the only purpose he pursued with the publication of the report-letter was inspired by his desire as a catholic, apostolic and roman, to cooperate for the best administration of the archbishopric's funds.

Of course, the trial judge in the case we are now considering did not have before him that evidence. And—undoubtedly because it was not considered relevant to the facts themselves of the criminal act charged—no proof was presented, either, to the effect that the defendant had declared at the previous civil case that if they pleased him in any of the three alternatives which he offered he would prevent the scandal. One of those alternatives consisted in a compensation—"fair and reasonable damages"—to which he thought he was entitled.

"A. I have not said I am going into a scandal. I want to prevent it. I am the one who wants to prevent it.

Q. And in what manner would it have been prevented?

A. Giving an explanation, as I explain, or reinstating me to my work.

Q. What else?

A. Or *paying me some* fair and reasonable *damages* to which I think I am entitled.

Q. *A compensation?*

A. *Correct.*

Q. In other words, that if they pleased you in any of those three alternatives, there would be no scandal, because you would not publish that?

A. *It could be understood like that."* (Italics ours.) (Tr. Ev., Vol. IV, pp. 52–53, civil case.)

The only purpose—conclusion of that court in the civil case—that the defendant had was "to put pressure on the plaintiff with the threat of circulating or publishing the letter if he did not receive the pecuniary compensation that he claimed", thus deflating what the defendant alleged.

After becoming acquainted with his true purpose of obtaining a pecuniary compensation, appellant's action, as revealed by the evidence in this case, of exhibiting a deadly weapon loaded with five bullets, placing it on the table around which a conversation about a possible compromise, through the payment of a sum of money, is carried out, does not seem strange.

The interval—from exhibiting to aiming—seems too short for us, and evidently also for the judge who saw and heard the evidence, particularly when the exhibition of the revolver is followed by the order: *please leave my house.*

The dissenting opinion puts into doubt the credibility of the witness for the prosecution for his role as complainant in a complaint on undertaking of bail against the defendant. That does not arise from the record. Neither do we know the scope and nature of the testimony offered by the character witnesses, as affirmed, in the case for security to keep the peace. It cannot appear in the record. The fact is that at the time when, according to said opinion, the complaint was filed —November 4, 1968—five months had already elapsed since the close of the trial, the presentation of evidence, and the weighing of the latter, and appellant had been found guilty and convicted of the offense charged. That was on June 26, 1968. The statements of the convict on November 7, 1968, were uttered during the act of the pronouncement of sentence, upon invitation of the judge, following the usual practice in these acts. Almost five months had already elapsed since he had been found guilty and convicted of the offense. His statements constituted in themselves an accusation of having been pursued unjustifiedly. They were not uttered under oath nor were they subject to examination through cross-examination by the prosecuting attorney. The statements of the convicts at that stage serve as an exhaust valve where they give free rein to emotion, deny the crime—almost never

do they admit it—and implore the clemency of the judge on the imposition of the punishment.

## II

It is set forth in the dissenting opinion that the father of the witness for the prosecution did not testify at the trial. It is affirmed that he could have testified about all he saw and heard there and that also, as part of the *res gestae*, he could have testified about the statements of the witness for the prosecution allegedly made after the incidents.

Evidently this reference to the father of the witness for the prosecution has the purpose of indicating that the prosecuting attorney suppressed evidence that was at his disposal in order to strengthen the testimony of the witness for the prosecution.

There is no such thing. This is not the type of case that requires evidence of corroboration. Rule 154 of the Rules of Criminal Procedure. Moreover, the record reveals that the father of the complainant was not present at the place where the incidents occurred. It was at the request of appellant himself that he left the dining room where he was, withdrawing to the porch.

The testimony of the father of the complainant was not suppressed by the prosecuting attorney. If something can be said it is that if there was suppression it originated, not from the prosecuting attorney, but from appellant. From the original record of the case (Folio 19) it appears that the defense, two months before the beginning of the trial (on March 27, 1968) announced that it would use as his witness the complainant's father, procured and obtained that summons be issued directed to him for his appearance at the trial, and afterwards the defense did not use that witness.

Appellant did not raise the question now indicated at the trial court, nor before us. I think it proper to recall that in *People v. Torres*, 86 P.R.R. 239, 242 (1962), this Court, with

the vote of the author of the dissent, established the following norm:

". . . and in *Viera* v. *Arizmendi,* 74 P.R.R. 36 (1952), we held that the fact that a person did not testify as a witness to one party does not raise any inference or presumption against the latter if he was never in court as witness or formally offered as such. See, also, *People* v. *Williams,* 344 P.2d 45 (Cal. 1959); *People* v. *Herrera,* 340 P.2d 690 (Cal. 1959); Note, *Evidence: Inferences From the Failure To Produce Evidence,* 30 Cal. L. Rev. 79 (1941). However, aside from the foregoing, the reality is that the presumption established by the Law of Evidence is rebuttable. The question that the testimony of a witness has been suppressed and the presumption which it entails must be raised before the trial judge. In such case the other party would have an opportunity to rebut the presumption explaining the reason for not producing the witness. 'The presumption which arises from the voluntary suppression of evidence may be rebutted by other evidence.' *People* v. *Ramírez,* 50 P.R.R. 224, 248 (1936), and *People* v. *Saldaña,* 40 P.R.R. 556 (1930). In weighing the evidence the judge shall then take into consideration all the circumstances present upon rendering judgment. This question was not raised before the trial judge. It is on appeal that it was raised for the first time."